# UNITED STATES DISTRICT COURT
## OF THE SOUTHERN DISTRICT OF FLORIDA

**Case No:**

STEFANO FRANCILLON,

     Plaintiff,

v.

MAPEI CORPORATION,
a foreign corporation,

     Defendant.

_____/

## COMPLAINT

COMES NOW, Plaintiff STEFANO FRANCILLON, (herein referred to as "Plaintiff") by and through his undersigned counsel, hereby files this complaint against Defendant, MAPEI CORPORATION, a foreign corporation and declares and avers as follows:

## VENUE AND JURISDICTION

1. Plaintiff brings a claim for discriminatory and retaliatory treatment and seeks relief pursuant to 42 U.S.C. §1981, §1981(a), *et seq.*

2. Defendant MAPEI CORPORATION (herein referred to as "MAPEI" or "Defendant") is an Illinois corporation headquartered at 1144 East Newport Center Drive, Deerfield Beach, Florida 33442.

3. Venue is proper in Broward County, Florida, insofar as the Defendant operates in Broward County, Florida and Plaintiff worked for Defendant in Broward County, Florida. Defendant is within the jurisdiction of this Court.

4. Plaintiff is a citizen and resident of Broward County and at all times worked for Defendant at its location in Broward County, Florida.

5.      This Court has federal question jurisdiction over the Plaintiff's discrimination and retaliation claims in this matter insofar as the matter involves a violation of 42 U.S.C. §1981, §1981(a), *et seq*.

## COMMON ALLEGATIONS

6.      Plaintiff is an African American male with Haitian roots, who began working for Defendant at Defendant's Deerfield Beach, Florida location on or about June 16, 2014 as a Corporate HR Coordinator.

7.      Plaintiff is well educated with a Bachelor's degree from Florida Atlantic University (FAU) in Boca Raton, Florida in 2011, and a Master's Degree in Public Administration (M.P.A.) from FAU in Boca Raton, Florida in 2013.

8.      While performing his duties as a Corporate HR Coordinator, Plaintiff also performed recruiting duties, such as recruiting, interviewing, pre-screening, conducting new hire orientations for all corporate employees, maintaining all external and internal trainings, maintaining all organizational charts for MAPEI Americas, revamped Exit Interview Guide, and was responsible for the educational encouragement program. Plaintiff also managed the Gas Card Program for all sales representatives, and the Second Language Program at the corporate office. Plaintiff created and maintained job descriptions and Requests for Resources.

9.      Under supervisors Vickie Brint, Adebola Morton, and Joan Stout, Plaintiff received positive performance reviews and positive performance evaluations. Because of Plaintiff's excellent performance, another HR supervisor, Elsa Villanueva, asked Plaintiff to work for her.

10.     On or about March 23, 2015, Zaharoula Nativi became Plaintiff's supervisor.

11.     On or about May 16, 2016, Carlo Amato became the new HR Director. Plaintiff shared with Amato that his goals were to become a recruiter and grow with the company. Plaintiff

also shared his goals with other supervisors, and it became common knowledge that Plaintiff's goals were to become a recruiter for Defendant.

12.     Plaintiff married in June of 2016. Upon his return from his honeymoon, on or about June 24, 2016, Nativi informed Plaintiff that Defendant was creating a Senior Staffing Specialist position which was a recruiting position and building a recruiting team. Plaintiff reacted with great excitement over the new team.

13.     Nativi quickly squelched Plaintiff's excitement by stating the only reason she told Plaintiff about the new position and team was that he was going to see the posting. Despite the fact Plaintiff had by this time been performing recruiting duties for over the past year, and held a Master's Degree in Public Administration, Nativi went on to tell him he was not qualified to apply because he did not have the AIRS Certification.

14.     Plaintiff did not apply for the Senior Staffing Specialist position after Nativi told Plaintiff he would not be considered for the position.

15.     Nativi discouraged Plaintiff from applying by stating he was not qualified and would not be considered for the position.

16.     On or about August 29, 2016, Defendant hired Kelsie Garlic for the Senior Staffing Specialist position.

17.     Kelsie Garlic is Caucasian and did not have the AIRS Certification.

18.     On or about November 24, 2016, Plaintiff obtained his AIRS Certification in order to qualify for future promotions and/or recruiting positions. The certification was geared towards recruiting, which was a one to two-day course, followed by an exam. The course essentially taught the students how to search on the internet for candidates. The exam was 25 questions with two hours for completion.

19.     After Plaintiff completed the AIRS Certification, Garlic questioned Plaintiff about the course and what he learned since Garlic did not himself have the Certification.

20.     In or about December of 2016, Plaintiff questioned Defendant about creating a recruiting position for him since he had been performing recruiting duties.

21.     Nativi told Plaintiff to be patient with his recruiting goals, that Defendant was building a requiring department.

22.     In or about December of 2016, Plaintiff questioned Defendant about attending conferences and obtaining other certifications to advance his career and be qualified for future promotional opportunities with Defendant.

23.     Nativi advised Plaintiff there was no room in the budget for him to attend conferences or obtain any other certifications to advance his career or to be qualified for future promotional opportunities with Defendant.

24.     Plaintiff explained to Nativi that his position could easily be split into two positions because of his high workload and large amount of responsibilities.

25.     Through his employment with Defendant, Plaintiff discussed the possibilities of him becoming a recruiter. During his evaluations, he continuously asked for promotions and to attend conferences that would improve his recruiting skills.

26.     In or about the beginning of 2017, Plaintiff began taking PHR (Professional in Human Resources) classes on Saturdays at FAU in Boca Raton.

27.     In 2017, Plaintiff repeatedly received positive feedback from coworkers, supervisors, and colleagues, including Leonor Hernandez, the regional HR Manager.

28.      Despite Defendant's statements that there was no room in the budget for him to attend conferences or obtain other certifications, on or about September 1, 2017, Garlic's salary went from approximately $86,699.86 to approximately $110,000.

29.      Plaintiff received a significantly smaller raise in the amount of $7,000 after his first year of employment with Defendant. Subsequently, Plaintiff received even smaller raises.

30.      Defendant also gave Garlic the opportunity to work from home two days per week, as well as an option to relocate to Arizona. The options of working remotely and relocating out of state were not provided to Plaintiff.

31.      Plaintiff suffered emotional stress from being denied the opportunity to promote, and watching his Caucasian counterpart enjoy promotions and opportunities. Plaintiff suffered physical symptoms from the stress of working in a discriminatory environment including lost weight.

32.      On or about September 27, 2017, a Staffing Specialist position became available at Defendant's Garland, Texas location. While it was a position lower than Garlic's, it was nonetheless a promotion and opportunity for Plaintiff to advance. Plaintiff was interested.

33.      Plaintiff approached Nativi regarding the open position in Texas, reminding her that Plaintiff's brother-in-law lives in Texas and that relocating would not be an issue. Nativi once again discouraged Plaintiff from applying for a promotion.

34.      Nativi informed Plaintiff that because the position was located out-of-state, Defendant would not consider him. Nativi conveyed to Plaintiff it was futile to seek this position and not to bother with applying.

35.      While Defendant told Plaintiff it would not consider him for an out-of-state position, it gave Garlic, a Caucasian, the option to relocate out of state and work remotely.

36.     In or about the end of 2017, Defendant gave Plaintiff the menial and entry level task of filing. This role was undesirable in that it was a step back towards Plaintiff's goals of advancement.

37.     While Plaintiff was aware the filing was backed up, it wasn't until he started filing did he realize how significantly backed up it was. There were literally pallets of paperwork to be filed.

38.     Brint told Plaintiff he wasn't being paid to file, that he had a master's degree.

39.     On or about November 13, 2017, Plaintiff met with Nativi regarding his goals. He once again reiterated his desire to become a recruiter and overall interest in advancing his career. Nativi became visibly annoyed and sternly replied that Plaintiff was to focus on filing as his top priority. Thereafter Nativi engaged in strict scrutiny of Plaintiff.

40.     Subsequent to the meeting on or about November 17, 2017 with Plaintiff, Nativi:

    a.     Dictated when Plaintiff could take his lunch, despite the policy that employees could lunch at any time, as long as the lunch break was no more than 60 minutes;

    b.     instructed Plaintiff to write down all of his completed tasks if it took him more than 30 minutes to complete the task;

    c.     instructed Plaintiff to limit his time away from his desk;

    d.     checked his LinkedIn profile;

    e.     monitored his movements on the camera; and

    f.     gave Plaintiff additional menial tasks such as filling in for the Mailroom Coordinator, maintenance personnel, or the Front Desk Receptionist.

41.     During 2017, Plaintiff continued to perform recruiting activities for Defendant without the title or pay of a recruiter. He was also filing and performing his job duties as the Corporate HR Coordinator. Additionally, he was filling in for the mailroom coordinator, receptionist, and maintenance personnel when those employees were out sick or otherwise.

42.     In or about January of 2018, Plaintiff applied for the position of HR Coordinator at Defendant's Ft. Lauderdale location, which was a lateral move for Plaintiff, in order to remove himself from the racially hostile environment at the Deerfield Beach, Florida location.

43.     On or about January 18, 2018, Elsa Villanueva contacted Plaintiff to interview for the HR Coordinator position in Ft. Lauderdale, Florida.

44.     When Plaintiff advised Nativi of his interview for the Ft. Lauderdale position, she responded that she knew, having already spoken with Villanueva. Her tone and body language were dismissive towards Plaintiff.

45.     On or about January 19, 2018, Plaintiff interviewed for the HR Coordinator position in Ft. Lauderdale, Florida. During the interview, Unit Manager Fred Gutierrez stated he had reservations about Plaintiff's desire to move laterally. Gutierrez discouraged Plaintiff from taking the position stating the Plaintiff was very young, that Defendant wanted a person who would be able to stay in the position for 10 years, and that there was no room for growth for me. Gutierrez told Plaintiff to do some soul searching over the weekend before he would advise Plaintiff of the next steps in the interview process. Gutierrez told Plaintiff that if he still wanted to move forward with the position, Plaintiff would need to come back to speak with Gutierrez about the following steps in pursuing the HR Coordinator position in Ft. Lauderdale, Florida. Plaintiff, having been working in HR for several years, knew these comments and behaviors from Gutierrez were not common practice.

46.     During the interview for the HR Coordinator position in Ft. Lauderdale, Plaintiff was asked the question what his supervisor would say about him. When he responded in the positive, that she would say he was a hard worker, the interviewers responded with a surprised, "oh really?" The interviewers were also surprised to hear Plaintiff had never been written up. It was clear to Plaintiff Nativi had given negative remarks about Plaintiff to the interviewers.

47.     On or about January 22, 2018, feeling pressured and discouraged from Villanueva, Plaintiff asked to be removed from the applicant pool, certain he would not get the position despite being qualified and having trained the previously HR Coordinator at the Ft. Lauderdale location.

48.     On or about January 22, 2018, after removing himself from the applicant pool, Plaintiff overheard Nativi on the phone with Villanueva and Gutierrez laughing. Nativi was talking with her speaker on, and Plaintiff clearly heard Gutierrez say "Stefano decided not to move forward. Did you get the email?" After laughter, Nativi stated, "He probably knows I said something about him!" More laughter followed.

49.     On or about February 26, 2018, Plaintiff filed a formal EEOC complaint about the racial discrimination he had experienced thus far.

50.     On or about March 1, 2018, subsequent to Plaintiff's formal discrimination complaint, Nativi put Plaintiff on a Performance Improvement Plan (PIP). Plaintiff had no write-ups or reprimands whatsoever. When Plaintiff questioned Nativi about the PIP, Nativi replied that everyone with a "needs improvement" on their performance evaluation was put on a PIP. Plaintiff, being an HR employee, knew this to be false and contrary to Defendant's discipline policies.

51.     Defendant rated two Caucasians, Corey Siggins and Steve Cameron, with "needs improvement" on their performance evaluations; however, did not give them PIPs.

52.     On or about March 1, 2018, subsequent to Plaintiff's discrimination complaint, Nativi again instructed Plaintiff that filing was to be his main priority, and removed all recruiting from Plaintiff's tasks. Coworkers asked Plaintiff if he was now the filing clerk and if he was being punished for something.

53.     Subsequent to Plaintiff's discrimination complaint:

a.      Defendant ostracized Plaintiff from his coworkers by instructing him to order food for an HR team luncheon and deliver the food to the HR team luncheon, without allowing him to eat lunch with the HR team;

b.      Nativi made loud sighs every time she walked past Plaintiff, began leaving sticky notes with tasks on them rather than speaking directly with Plaintiff;

c.      Defendant no longer included Plaintiff in monthly HR team meetings;

d.      Nativi handed Plaintiff his PIP evaluation, a personal HR matter, out in the open by his cubicle rather than behind closed doors as she had before with personal HR matters his complaint;

e.      Amato told Plaintiff he would instruct managers to no longer give Plaintiff work because Plaintiff needed to file;

f.      Nativi instructed Debbie Funicello that Plaintiff could not perform tasks for Funicello because of his EEOC complaint;

g.      Defendant requested Plaintiff to sign a PIP form that had inaccurate information on it, in that Defendant misrepresented Plaintiff refused to give an estimation as to when the filing would be caught up;

h.      Defendant instructed Plaintiff to fill in for the receptionist;

i.     Defendant assigned Plaintiff time-sensitive tasks then instructed Plaintiff to walk around the office to gain signatures, which is extremely time consuming, then reprimanding Plaintiff for not completing other time-sensitive tasks;

j.     Defendant would not allow Plaintiff to email documents to be signed, which was a faster way to gain signatures since some employees were out on PTO, working remotely, or not otherwise in the office;

k.     Defendant allowed a non-African American employee, Barbara, to gather signatures via email;

l.     Nativi told one of Plaintiff's coworkers to let Nativi know if Plaintiff missed any deadlines so he could be disciplined through his PIP;

m.    Defendant instructed Plaintiff to work in the mailroom;

n.     Nick Di Tempora, the Chairman of the Board, placed his hands around Plaintiff's neck and stated "I could break your neck;"

54.     Defendant posted Plaintiff's EEOC complaint on its website, after which directors stared at Plaintiff, employees no longer spoke with Plaintiff, HR team members stopped inviting him to lunch, and others asked Plaintiff if he was ok because they saw his EEOC claim on the company's website.

55.     Defendant posted "SF EEOC Matter" on the company's Outlook calendar in the subject line for a phone call on or about March 27, 2018, again prompting more ostracization of Plaintiff from coworkers.

56.    On or about May 17, 2018, Plaintiff formally complained to Amato regarding the racial discrimination and retaliation. Amato stated he would investigate Plaintiff's complaint, however Plaintiff never heard about any investigation.

57.    Defendant's culture is one that promotes racism by allowing racial comments in the workplace, including but not limited to:

    a.    "Black people are like dogs, everyone has one;"

    b.    "What are you for Halloween? A thug?"

    c.    "Do a spiritual dance that will remove the evil spirits since Haitians do Voodoo with chickens by cutting off the chicken heads;" and

    d.    "Are you trying to be Martin Luther King or Kaepernick, same thing happened to Resnick and nothing changed here. You should get out."

58.    Defendant's conduct creates a racially hostile culture and one that promotes racism by:

    a.    Hiring African Americans primarily for hourly and entry level positions;

    b.    Promoting primarily Caucasians to management and upper level positions;

    c.    Keeping an executive team of exclusively Caucasian or non-African American members, specifically the Leadership Team which was comprised of Directors, CEO, and Chairman of the Board.

    d.    Virtually no African American employees held positions in the Sales Department;

    e.    Assigning Dr. Teddie Malangwasira, an African American HR Manager, a cubicle instead of an office;

      f.      Assigning a Caucasian Staffing Manager, Jack Greenblott, an office rather than a cubicle;

      g.      Transferring Dr. Malangwasira to a conference room with a table rather than a desk after Dr. Malangwasira complained about being in a cubicle;

      h.      Asking an African American employee for her tax return upon hiring her while not asking Caucasian employees for their tax returns upon their hire;

      i.      Not paying Resnick Hampton, an African American employee, the same amount as his Caucasian counterparts;

      j.      Using Brandon McQuerry, an African American engineer, for tasks such as paperwork rather than his function as an engineer; and/or

      k.      Refusing an African American employee, Jesse Williams, from selling cupcakes while allowing a non African-American employee, Nativi, to sell candy.

59.      Defendant's actions and/or inactions created a hostile work environment for Plaintiff.

60.      On or about June 7, 2018, Plaintiff was constructively discharged when he resigned in that the working conditions were so difficult and unpleasant that a reasonable person in Plaintiff's shoes would have also been compelled to resign.

61.      Subsequent to Plaintiff's constructive discharge, Dr. Malangwasira told Plaintiff Nativi stated she was excited about Plaintiff's replacement, an African American being relocated from Georgia, "because now it looks like we aren't racist."

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

62.     Plaintiff has exhausted all administrative remedies prior to the filing of this action.

63.     Plaintiff timely filed a charge of discrimination. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ["EEOC"] as well as with the Florida Commission on Human Relations ["FCHR"]. (Please see a true and correct copy of said Charge filed with the Florida Commission on Human Relations attached hereto as Exhibit "1").

64.     It has been more than one-hundred eighty (180) days since the filing of Plaintiff's Charge of Discrimination.

## COUNT I – DISCRIMINATION
## IN VIOLATION OF 42 U.S.C §§ 1981, 1981(A)

65.     Plaintiff incorporates by reference all allegations of this Complaint as if set forth fully herein.

66.     Defendant engaged in racially discriminatory conduct towards Plaintiff such that he was deprived of his civil rights.

67.     Defendant is an employer within the meaning of 42 U.S.C. §1981.

68.     Plaintiff is an African American male, subject to the protections of 42 U.S.C. §1981.

69.     Plaintiff was subject to adverse employment treatment including:

    a.      Being discouraged to apply for promotional opportunities;

    b.      Being told he was not qualified to apply for promotional opportunities;

    c.      Being told he would not be considered for promotional opportunities;

    d.      Being denied opportunities to obtain certifications to advance his career with Defendant

e.     Being denied opportunities to attend conferences to advance his career with Defendant;

f.     Not given opportunity to work remotely or relocate out of state;

g.     Being forced to perform menial tasks;

h.     Forced to take lunch when Defendant dictated;

i.     Write down tasks if the tasks took longer than 30 minutes;

j.     Having his movements monitored by Defendant on camera;

k.     Filling in for the mailroom coordinator, front desk receptionist, and maintenance personnel;

l.     Having his interview for a position outside the supervision of Nativi hijacked by Defendant;

m.     Put on PIP plan despite no writeups or reprimands;

n.     Given menial task of filing;

o.     Being ostracized from his coworkers;

p.     Not included in monthly HR meetings;

q.     Having his personal information made public;

r.     Being forced to walk around to obtain signatures from all employees on Veteran and Disability paperwork;

s.     Being reprimanded for not completing time-sensitive tasks after being given an impossible amount of tasks to complete, or in other words, being set up for failure;

t.     Being subject to racist comments;

u.      Having the Chairman of the Board put his hands around Plaintiff's neck

stating "I could break your neck; and/or

v.      Constructive discharge.

70.     By and through the conduct described above, Defendant permitted a pattern and practice of unlawful discrimination by allowing Plaintiff to continue to be subjected to disparate treatment and discrimination in violation of 42 U.S.C. §§1981,1981(a).

71.     Plaintiff contends that Defendant has a policy, pattern and practice of treating similarly situated, Non-African American employees more favorably than African American employees.

72.     Plaintiff contends that Defendant applies employment policies such as: anti-discrimination and discipline in a disparate manner.

73.     Defendant failed to acknowledge the discriminatory treatment of Plaintiff.

74.     Defendant knew or should have known that Plaintiff was being discriminated against and being treated in a manner disparate and less favorable than other similarly situated Non-African American employees by the Defendant, agents, employees and/or representatives.

75.     Despite said knowledge, Defendant failed to take any remedial action.

76.     By and through the conduct described above, Defendant permitted a pattern and practice of unlawful discrimination by permitting Plaintiff to be subjected to continuing disparate treatment on the basis of race in violation of 42 U.S.C. §1981.

77.     Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

78.     Plaintiff is informed and believes and based thereon alleges, that in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices which

are not yet fully known.  At such time as the discriminatory practices become known, Plaintiff will seek leave of the Court to amend the Complaint in this regard.

79.     Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees and/or representatives.

80.     As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

81.     As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

82.     Plaintiff requests that he be awarded damages, including general, compensatory, and punitive damages and reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. §§1981, 1981(a).

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. §§1981, 1981(a); and that Plaintiff be awarded such other relief as the Court deems just and proper.

## <u>COUNT II – RETALIATION</u><br><u>IN VIOLATION OF 42 U.S.C §§ 1981, 1981(A)</u>

83.     Plaintiff incorporates by reference all allegations of this Complaint as if set forth fully herein.

84.     Plaintiff engaged in a statutorily protected activity of complaining about the discrimination he experienced.

85.     After he complained, he suffered many adverse employment actions, including but not limited to:

a.      Being discouraged to apply for promotional opportunities;

b.      Being told he was not qualified to apply for promotional opportunities;

c.      Being told he would be considered for promotional opportunities;

d.      Being denied opportunities to obtain certifications to advance his career with Defendant

e.      Being denied opportunities to attend conferences to advance his career with Defendant;

f.      Not given opportunity to work remotely or relocate out of state;

g.      Being forced to perform menial tasks;

h.      Forced to take lunch when Defendant dictated;

i.      Write down tasks if the tasks took longer than 30 minutes;

j.      Having his movements monitored by Defendant on camera;

k.      Filling in for the mailroom coordinator, front desk receptionist, and maintenance personnel;

l.      Having his interview for a position outside the supervision of Nativi hijacked by Defendant;

m.     Put on PIP plan despite no writeups or reprimands;

n.      Given menial task of filing;

o.      Being ostracized from his coworkers;

p.      Not included in monthly HR meetings;

q.      Having his personal information made public;

r.      Being forced to walk around to obtain signatures from all employees on the Veteran and Disability paperwork;

     s.     Being reprimanded for not completing time-sensitive tasks after being given an impossible amount of tasks to complete, or in other words, being set up for failure;

     t.     Being subject to racist comments;

     u.     Having the Chairman of the Board put his hands around Plaintiff's neck stating "I could break your neck; and/or

     v.     Constructive discharge.

86.     There is sufficient evidence of knowledge of Plaintiff's complaint of discrimination, as it was posted on Defendant's website, and on its company Outlook calendar.

87.     There is a causal link between Plaintiff's protected activity of complaining about racial discrimination and his adverse employment actions, in that, for instance, Nativi instructed Debbie Funicello that Plaintiff could not perform tasks for Funicello because of his EEOC complaint.

88.     Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees and/or representatives.

89.     Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

90.     As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

91.     As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

92.     Plaintiff requests that he be awarded damages, including general, compensatory, and punitive damages and reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. §§1981, 1981(a).

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. §§1981, 1981(a); and that Plaintiff be awarded such other relief as the Court deems just and proper.

## COUNT III – HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C §§ 1981, 1981(A)

93.     Plaintiff incorporates by reference all allegations of this Complaint as if set forth fully herein.

94.     Defendant's conduct alleged herein was so severe and/or pervasive that it altered the terms and/or conditions of Plaintiff's employment.

95.     Defendant's workplace permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's employment and created an abusive working environment, created by Defendant's following conduct:

    a.      Hiring African Americans primarily for hourly and entry level positions;

    b.      Promoting primarily Caucasians to management and upper level positions;

    c.      Keeping an executive team of exclusively Caucasian or non-African American members, specifically the Leadership Team which was comprised of Directors, CEO, and Chairman of the Board.

    d.      No African American employees held positions in the Sales Department;

e.      Assigning Dr. Teddie Malangwasira, an African American Training & Talent Management Manager, a cubicle instead of an office;

f.      Assigning a Caucasian Staffing Manager, Jack Greenblott, an office rather than a cubicle;

g.      Transferring Dr. Malangwasira to a conference room with a table rather than a desk after Dr. Malangwasira complained about being in a cubicle;

h.      Asking an African American employee for her tax return upon hiring her while not asking Caucasian employees for their tax returns upon their hire;

i.      Not paying Resnick Hampton, an African American employee, the same amount as his Caucasian counterparts;

j.      Using Brandon McQuerry, an African American engineer, for tasks such as paperwork rather than his function as an engineer; and/or

k.      Refusing an African American employee, Jesse Williams, from selling cupcakes while allowing a non African-American employee, Nativi, to sell candy.

96.    The conditions of Plaintiff's employment were altered in that:

a.      Hiring African Americans primarily for hourly and entry level positions;

b.      Promoting primarily Caucasians to management and upper level positions;

c.      Keeping an executive team of exclusively Caucasian or non-African American members, specifically the Leadership Team which was comprised of Directors, CEO, and Chairman of the Board.

d.      No African American employees held positions in the Sales Department;

e.     Assigning Dr. Teddie Malangwasira, an African American HR Manager, a cubicle instead of an office;

f.     Assigning a Caucasian HR Manager, Jack Greenblott, an office rather than a cubicle;

g.     Transferring Dr. Malangwasira to a conference room without a desk after Dr. Malangwasira complained about being in a cubicle;

h.     Asking an African American employee for her tax return upon hiring her while not asking Caucasian employees for their tax returns upon their hire;

i.     Not paying Resnick Hampton, an African American employee, the same amount as his Caucasian counterparts;

j.     Using Brandon McQuerry, an African American engineer, for tasks such as paperwork rather than his function as an engineer; and/or

k.     Refusing an African American employee, Jesse Williams, from selling cupcakes while allowing a non-African American employee, Nativi, to sell candy.

97.     Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees and/or representatives.

98.     Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

99.     As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

100.     As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

101.    Plaintiff requests that he be awarded damages, including general, compensatory, and punitive damages and reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. §§1981, 1981(a).

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. §§1981, 1981(a); and that Plaintiff be awarded such other relief as the Court deems just and proper.

## COUNT IV – CONSTRUCTIVE DISCHARGE

102.    Plaintiff incorporates by reference all allegations of this Complaint as is set forth fully herein.

103.    Defendant's conduct and/or lack of conduct alleged herein was so severe and/or pervasive that it altered the terms and/or conditions of Plaintiff's employment.

104.    Defendant's conduct and/or lack of conduct imposed working conditions that were so intolerable Plaintiff was forced to resign.

105.    The working conditions imposed by Defendant's conduct and/or lack of conduct were so intolerable that a reasonable person in Plaintiff's position would have been compelled to resign.

106.    Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees and/or representatives.

107.    Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

108.    As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

109.    As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

110.    Plaintiff requests that he be awarded damages, including general, compensatory, and punitive damages and reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. §§1981, 1981(a).

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. §§1981, 1981(a); and that Plaintiff be awarded such other relief as the Court deems just and proper.

## COUNT V– DISCRIMINATION
## FLORIDA CIVIL RIGHTS ACT FLA. STAT. § 760 *ET SEQ.*

111.    Plaintiff incorporates by reference all allegations of this Complaint as if set forth fully herein.

112.    Plaintiff engaged in a statutorily protected activity of complaining about the discrimination he experienced.

113.    After he complained, he suffered many adverse employment actions, including but not limited to:

    a.    Being discouraged to apply for promotional opportunities;

    b.    Being told he was not qualified to apply for promotional opportunities;

    c.    Being told he would be considered for promotional opportunities;

d.     Being denied opportunities to obtain certifications to advance his career with Defendant

e.     Being denied opportunities to attend conferences to advance his career with Defendant;

f.     Not given opportunity to work remotely or relocate out of state;

g.     Being forced to perform menial tasks;

h.     Forced to take lunch when Defendant dictated;

i.     Write down tasks if the tasks took longer than 30 minutes;

j.     Having his movements monitored by Defendant on camera;

k.     Filling in for the mailroom coordinator, front desk receptionist, and maintenance personnel;

l.     Having his interview for a position outside the supervision of Nativi hijacked by Defendant;

m.     Put on PIP plan despite no writeups or reprimands;

n.     Given menial task of filing;

o.     Being ostracized from his coworkers;

p.     Not included in monthly HR meetings;

q.     Having his personal information made public;

r.     Being forced to walk around to obtain signatures from all employees on the Veteran and Disability paperwork;

s.     Being reprimanded for not completing time-sensitive tasks after being given an impossible amount of tasks to complete, or in other words, being set up for failure;

t.   Being subject to racist comments;

u.   Having the Chairman of the Board put his hands around Plaintiff's neck stating "I could break your neck; and/or

v.   Constructive discharge.

114.   There is sufficient evidence of knowledge of Plaintiff's complaint of discrimination, as it was posted on Defendant's website, and on its company Outlook calendar.

115.   There is a causal link between Plaintiff's protected activity of complaining about racial discrimination and his adverse employment actions, in that, for instance, Nativi instructed Debra Funicello that Plaintiff could not perform tasks for Funicello because of his EEOC complaint.

116.   Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees and/or representatives.

117.   Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

118.   As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

119.   As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

120.   Plaintiff requests that he be awarded damages, including general, compensatory, and punitive damages and reasonable attorney's fees and costs of suit pursuant to the FCRA.

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to

Fla. Stat. § 760 *et seq.,* (FCRA); and that Plaintiff be awarded such other relief as the Court deems just and proper.

## **COUNT VI – DISCRIMINATION – DISPARATE TREATMENT IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964, TITLE VII, 42 U.S.C. § 2000e *et seq.*, (1964)**

121.    Plaintiff incorporates by reference all allegations of this Complaint as if set forth fully herein.

122.    Defendant is an employer within the meaning of Title VII.

123.    Plaintiff is an African American male, subject to the protections under Title VII.

124.    Plaintiff was subject to adverse employment treatment, including:

    a.    Being discouraged to apply for promotional opportunities;

    b.    Being told he was not qualified to apply for promotional opportunities;

    c.    Being told he would be considered for promotional opportunities;

    d.    Being denied opportunities to obtain certifications to advance his career with Defendant

    e.    Being denied opportunities to attend conferences to advance his career with Defendant;

    f.    Not given opportunity to work remotely or relocate out of state;

    g.    Being forced to perform menial tasks;

    h.    Forced to take lunch when Defendant dictated;

    i.    Write down tasks if the tasks took longer than 30 minutes;

    j.    Having his movements monitored by Defendant on camera;

    k.    Filling in for the mailroom coordinator, front desk receptionist, and maintenance personnel;

l.     Having his interview for a position outside the supervision of Nativi hijacked by Defendant;

m.    Put on PIP plan despite no writeups or reprimands;

n.    Given menial task of filing;

o.    Being ostracized from his coworkers;

p.    Not included in monthly HR meetings;

q.    Having his personal information made public;

r.    Being forced to walk around to obtain signatures from all employees on the Veteran and Disability paperwork;

s.    Being reprimanded for not completing time-sensitive tasks after being given an impossible amount of tasks to complete, or in other words, being set up for failure;

t.    Being subject to racist comments;

u.    Having the Chairman of the Board put his hands around Plaintiff's neck stating "I could break your neck; and/or

v.    Constructive discharge.

125.    Defendant treated similarly situated, non-African American employees more favorably in that non-African American employees:

a.    Could email coworkers for signatures rather than walk around and get the signatures manually;

b.    Could work remotely;

c.    Could relocate out of state;

d.    Could apply for promotions;

    e.      Applied for and received promotions despite lack of credentials;

    f.      Had offices rather than cubicles;

    g.      Received higher pay;

    h.      Performed the job duties that aligned with their positions;

    i.      Sold items in the workplace;

    j.      Did not receive PIPs after getting a "needs improvement" on their performance evaluations;

    k.      Hold positions of Leadership Team which was comprised of Directors, CEO and Chairman of the Board;

    l.      Receive promotions to management and upper level positions; and/or

    m.      Hold positions in the Sales Department;

126.    Plaintiff contends the adverse actions described above were pre-textual.

127.    By and through the conduct described above, Defendant permitted a pattern and practice of unlawful discrimination by allowing Plaintiff to continue to be subjected to disparate treatment and discrimination in violation of Title VII.

128.    Plaintiff contends Defendant has a policy, pattern, and practice of treating similarly situated non-African American employees more favorably than African American employees.

129.    Plaintiff contends that Defendant applies employment policies such as hiring African Americans for hourly and entry level positions; failing to promote African Americans; and keeping an executive team of exclusively Caucasian or non-African American members, specifically the Leadership Team which was comprised of Directors, CEO, and Chairman of the Board.

130.    Defendant failed to acknowledge and/or redress the discriminatory treatment of Plaintiff.

131.    Defendant knew or should have known that Plaintiff was being discriminated against and being treated in a manner disparate and less favorable that other similarly situated non-African American employees by the Defendant, its agents, employees, and/or representatives.

132.    Despite said knowledge, Defendant failed to take any remedial action.

133.    By and through the conduct described above, Defendant permitted a pattern and practice of unlawful discrimination by permitting Plaintiff to be subjected to continuing disparate treatment on the basis of race in violation of Title VII.

134.    Plaintiff is informed and believes and based thereon alleges, that in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices which are not yet fully known. At such time the discriminatory practices become known, Plaintiff will seek leave of the Court to amend the Complaint in this regard.

135.    Plaintiff has suffered damages as a result of Defendant's conduct, by and through its agents, employees, and/or representatives.

136.    As a result of Defendant's conduct, Plaintiff has suffered general, compensatory, and punitive damages.

137.    Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

138.    As a further result of Defendant's conduct, Plaintiff has retained the undersigned law firm and is obligated to pay a reasonable fee.

139.    Plaintiff requests that he be awarded damages, including general, compensatory, punitive, and reasonable attorney's fees and costs of suit pursuant to Title VII.

WHEREFORE, Plaintiff prays that judgment be entered in his favor against Defendant as follows: That Plaintiff be awarded general, compensatory, and punitive damages, reinstatement, or front pay, back pay, that Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000 *et seq*., (Title VII) and that Plaintiff be awarded such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs further demand a jury trial on all triable issues.

Dated this 13th  day of August 2020.

SCOTT WAGNER & ASSOCIATES, P.A.
Jupiter Gardens
250 South Central Boulevard
Suite 104-A
Jupiter, FL 33458
Telephone: (561) 653-0008
Facsimile: (561) 653-0020

s/Cathleen Scott
Cathleen Scott, Esq.
Florida Bar No. 135331
Primary e-mail: CScott@scottwagnerlaw.com
Secondary e-mail: mail@scottwagnerlaw.com
Secondary Address: 101 Northpoint Parkway
West Palm Beach, FL 33407
www.ScottWagnerLaw.com